**PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-1763
_____

UNITED STATES OF AMERICA

v.

HAZIZ SELF
a/k/a HAZEK

HAZIZ SELF,
                    Appellant
_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE EASTERN DISTRICT OF
PENNSYLVANIA
(D.C. Crim. No. 09-cr-00512-002)
District Judge:  Honorable Paul S. Diamond
_____

Submitted Under Third Circuit LAR 34.1(a)
April 17, 2012
_____

Before: VANASKIE, BARRY and CUDAHY,[*] Circuit
Judges

(Opinion Filed: May 30, 2012)
_____

_____

[*]  Honorable Richard D. Cudahy, Senior Circuit Judge for the
United States Court of Appeals for the Seventh Circuit, sitting
by designation.

Jeremy H.G. Ibrahim, Sr., Esq.
P.O. Box 1025
1631 Baltimore Pike
Chadds Ford, PA 19317-0000

Counsel for Appellant


K. T. Newton, Esq.
Office of United States Attorney
615 Chestnut Street
Suite 1250
Philadelphia, PA 19106

Counsel for Appellee

_____

OPINION OF THE COURT
_____

BARRY, Circuit Judge

Haziz Self ("Haziz") was sentenced to 120 months' imprisonment after being convicted on two counts of distributing crack cocaine. On appeal, Haziz raises a number of challenges to both the underlying convictions and the subsequent sentence. We will affirm the convictions but vacate the sentence and remand for resentencing.

## I. Background

### A. Underlying Offense

On March 4, 2009, a confidential informant ("CI") made a series of recorded telephone calls to Haziz's brother, Rahmmar Self ("Rahmmar"), to arrange for the purchase of one-half ounce of crack cocaine. In those conversations, Rahmmar instructed the CI to proceed to his house to buy the drugs and informed him that "[m]y brother is going to meet you." While wearing concealed audio and video recording

2

devices, the CI proceeded to the house, where he purchased approximately twelve grams of crack from Haziz for a price of $500. Based on this transaction, a grand jury in Philadelphia returned a two count indictment charging Haziz and Rahmmar with: (1) distribution of five grams or more of cocaine base, in violation of 21 U.S.C. § 841(a)(1); and (2) distribution of cocaine base within 1,000 feet of a housing facility owned by a public housing authority, in violation of 21 U.S.C. § 860(a).[1]

## B. Disqualification

Haziz was initially represented by a court-appointed attorney, but Mark Greenberg, Esq. ("Greenberg"), entered an appearance on behalf of Haziz on September 10, 2009. That same day, Barnaby Wittels, Esq. ("Wittels"), entered an appearance on behalf of Rahmmar. Greenberg and Wittels are attorneys in the same four-lawyer firm, Lacheen Wittels & Greenberg, LLP.

Shortly after Greenberg and Wittels entered their appearances, the government raised the potential conflict of interest created by the same firm representing the two co-defendants. Magistrate Judge Elizabeth T. Hey conducted a hearing in accordance with Federal Rule of Criminal Procedure 44(c), during which both Greenberg and Wittels stated that they did not believe that a conflict would arise from their joint representation, and both defendants waived their right to be represented by conflict-free counsel. Several weeks later, U.S. District Judge John R. Padova questioned each defendant separately. Again, Wittels and Greenberg stated that they foresaw no potential conflict. Rahmmar, who has a tenth-grade education, again waived any conflict of interest. Haziz, who completed high school, asked Judge Padova to explain how a conflict might manifest itself, requested a court recess to consider his options, and waived any conflict after discussing the issue with his attorney.

---

[1] The grand jury subsequently returned a superseding indictment adding five drug-related counts against Rahmmar only.

3

Two days after this hearing, Wittels had an apparent change of heart and moved to withdraw his representation on conflict grounds. In his motion, Wittels explained:

> After reflection it is apparent to undersigned counsel that no workable protocol can be created that will satisfy the court's concerns and that no workable "Chinese Wall" could be erected in what is a four lawyer firm in which the offices of counsel in this case are adjacent to one another and in which there is a common receptionist.

U.S. District Judge Paul S. Diamond, to whom the case had been reassigned, held a hearing on Wittels' motion to withdraw. At the hearing, Wittels acknowledged that it was "very unusual for two lawyers in one firm to represent co-defendants in a federal case," and further explained that he now believed that the joint representation "would create a situation in which it would only damage the attorneys and my client. The potential for problems is just too great."

After the District Court granted Wittels' motion to withdraw, it questioned Greenberg about why he should not also be disqualified, stating: "I am concerned about your ability vigorously to represent your client against, possibly against, the interests of another person, who was very recently a client of your firm." Although Greenberg asserted that his representation of Haziz would not be limited by his firm's prior representation of Rahmmar, the Court remained concerned about a potential conflict. The hearing concluded with a discussion of two motions to continue the trial: one filed by the government, and the other filed by Wittels prior to his withdrawal. Greenberg objected to the government's motion, stating that Haziz was "ready to go to trial and we're prepared to go to trial." However, Greenberg also stated that he did not object to Wittels' motion for a continuance, a contradictory position that the Court believed "may well

4

underscore the need for two new counsel in this case."[2]

On December 30, 2009, the District Court ordered that Greenberg be disqualified due to a serious potential for conflict. In a meticulous opinion accompanying the order, the Court explained that "Greenberg's continued presence in this case presents a minefield of potential problems that would compel me constantly to evaluate whether he is acting in the best interest of his firm's existing client or in his firm's former client." The Court then appointed Jeremy Ibrahim, Esq., as Haziz's new defense counsel.

## C. Trial

Haziz's trial began on June 22, 2010.[3] Simply put, the government's evidence of guilt was very strong. In addition to the eyewitness testimony of several ATF agents, the government also produced audio and video recordings of the CI's drug transaction with Haziz. Additionally, the CI testified that after making arrangements with Rahmmar over the phone, he purchased two baggies of crack cocaine from Haziz, whom he knew personally. His testimony continued:

> I went in there, gave [Haziz] the money right away, he counted it, he told me that -- that he -- you know, he don't do this anymore, he was just doing a favor for his -- for his brother. After that he gave me the crack cocaine and I proceeded to leave.

The government also called Ninan Varughese ("Varughese"), a forensic chemist employed by the Philadelphia Police Department Chemistry Laboratory. Varughese testified that he tested the substance in one of the

---

[2] After the District Court expressed some exasperation about this contradictory stance, Greenberg backtracked and stated that he also objected to Wittels' motion to continue the trial.

[3] Rahmmar pled guilty on May 17, 2010 and was subsequently sentenced to 120 months of imprisonment.

two baggies purchased by the CI and determined that it contained cocaine base, that the tested bag contained 5.494 grams of cocaine base, and that the total weight of both baggies was 12.05 grams.

Finally, the government called Devinearth Freeman ("Freeman"), Haziz's niece, who lived in the same house as Haziz and was present in the house at the time of the drug transaction with the CI. Upon being interviewed by ATF agents prior to trial, Freeman had refused to say whether Haziz was present at the time of the transaction. At trial, when Freeman was shown a video recording of the transaction, she claimed to be unable to identify Haziz in the video. This led to the following exchange, as the prosecutor questioned Freeman about her possible bias:

> Q: And when you were asked if Haziz was in the kitchen the first time, you just didn't answer that question, didn't you?
>
> A: No, I didn't.
>
> Q: Because your Uncle Haziz is like a father to you, right?
>
> A: Oh, yeah.
>
> Q: And you don't want to see him go to jail?
>
>> MR. IBRAHIM: Judge, I'm going to object.
>>
>> THE COURT: Over --
>>
>> MR. IBRAHIM: This is her witness.
>>
>> THE COURT: -- overruled. Please.
>>
>> THE WITNESS: He's already in jail.
>>
>> THE COURT: Repeat the question.

> Q: You don't want to see him get convicted and spend more time in jail, do you?
>
> A: He's already in jail.

After the jury was dismissed for the day, defense counsel moved for a mistrial, arguing that Haziz had been prejudiced by Freeman's statements that he was already in jail. The District Court declined to grant a mistrial but invited defense counsel to submit a cautionary instruction. Defense counsel did so, and the Court read the instruction to the jury the next morning.

### D. Allegations by Alternate Juror

Following three days of evidence, the trial concluded and the District Court instructed the jury. The Court then separated the two alternate jurors, who did not participate in deliberations, and twelve jurors repaired to the jury room to deliberate. After approximately two hours, the jury returned a unanimous verdict finding Haziz guilty on both counts. The Court polled the jury, and each member confirmed his or her agreement with the verdict.

After the jury was dismissed and the courtroom had emptied, however, one of the alternate jurors approached the courtroom deputy and stated that "several" of the jurors had told her that "they went along with the verdict even though they did not necessarily agree with it." The deputy asked the alternate juror to write down her name and telephone number, as well as the names of the jurors who did not necessarily agree with the verdict. The alternate wrote down her name and the name of one other juror, and the deputy passed this information along to the District Court.

The next day, the District Court conducted a phone conference during which it informed counsel of the alternate juror's allegations. Defense counsel moved to interview the alternate juror, a request the government opposed. In a memorandum opinion, the Court denied the motion.

7

### E. Sentencing

The presentence report ("PSR") found Haziz to have an offense level of 22 and a criminal history category of III, which resulted in a guideline range of 51 to 63 months. However, because he had a prior felony drug conviction and because his offense involved more than five grams of cocaine base, Haziz was subject to a ten-year mandatory minimum sentence pursuant to 21 U.S.C. § 841(b)(1)(B).

On March 18, 2011, Haziz appeared for sentencing and raised several objections to the PSR. First, he argued that the Court should apply the Fair Sentencing Act of 2010 ("FSA"), which would preclude him from being subject to a mandatory minimum sentence. The Court rejected this argument, holding that the FSA, which was passed before Haziz's sentencing but after his conviction, did not apply to defendants who had been convicted prior to its enactment. Next, Haziz objected to the calculation of his offense level, arguing that: (1) the offense level should reflect only the weight of one of the two baggies of crack (i.e. the baggie that actually had been tested); and (2) he was entitled to a "mitigating role" adjustment pursuant to U.S.S.G. § 3B1.2. The Court rejected both of these objections as well, and noted that, in any event, disagreements as to the offense level were moot in light of the 120-month mandatory minimum sentence. The Court then sentenced Haziz to 120 months of imprisonment with eight years of supervised release. Haziz timely appealed.

## II. Discussion[4]

Haziz identifies six separate instances of possible error: (1) the disqualification of Greenberg; (2) the denial of his motion for a mistrial; (3) the denial of defense counsel's request to interview the alternate juror; (4) the District Court's refusal to adopt a "mitigating role" adjustment; (5) the total

_____

[4] The District Court had jurisdiction pursuant to 18 U.S.C. § 3231. We have jurisdiction pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

weight of the drugs involved in the offense; and (6) the use of pre-FSA thresholds for determining whether a mandatory minimum sentence applied. No error was committed as to all but one of these allegations. As to that one, we conclude, and the government concedes, that in the wake of our decision in *United States v. Dixon*, 648 F.3d 195 (3d Cir. 2011), the FSA applies and Haziz is not subject to a mandatory minimum sentence. Accordingly, although we affirm the convictions, we will remand for resentencing.

## A. Disqualification

Haziz argues, first, that the District Court's disqualification of Greenberg, his privately retained counsel, violated his Sixth Amendment right to counsel of his choice and, thus, that his convictions should be reversed. We review a district court's disqualification order in two stages. "First, we exercise plenary review to determine whether the district court's disqualification was arbitrary—the product of a failure to balance proper considerations of judicial administration against the right to counsel." *United States v. Stewart*, 185 F.3d 112, 120 (3d Cir. 1999) (citation and internal quotations omitted). If the order was not arbitrary, "we then determine whether the court abused its discretion in disqualifying the attorneys." *Id.* Because Haziz concedes that the Court "did not issue an arbitrary ruling," the only question is whether it abused its discretion in determining that Greenberg's representation of Haziz gave rise to a serious potential for conflict of interest. We answer that question in the negative.

"The right to select counsel of one's choice . . . has been regarded as the root meaning of the [Sixth Amendment's] constitutional guarantee." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 147-48 (2006). "The right to counsel of choice, however, is not absolute. Thus, where considerations of judicial administration supervene, the presumption in favor of counsel of choice is rebutted and the right must give way." *United States v. Voigt*, 89 F.3d 1050, 1074 (3d Cir. 1996) (citation and internal quotations omitted). A conflict of interest arising from the joint representation of criminal co-defendants is one instance in which a defendant's

9

right to counsel of choice may be rebutted, as joint representation in a criminal case "engenders special dangers of which a court must be aware."[5] *United States v. Wheat*, 486 U.S. 153, 159 (1988). Indeed, the Federal Rules of Criminal Procedure place an affirmative duty on district courts to investigate when this particular danger appears:

> The court must promptly inquire about the propriety of joint representation and must personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless there is good cause to believe that no conflict of interest is likely to arise, the court must take appropriate measures to protect each defendant's right to counsel.

Fed. R. Crim. P. 44(c ). It is well-established that disqualification of counsel is among the "appropriate measures" available to a district court in cases of conflict caused by joint representation. *See, e.g.*, *Voigt*, 89 F.3d at 1078; *United States v. Flanagan*, 679 F.2d 1072, 1076 (3d Cir. 1982), *vacated on other grounds*, 465 U.S. 259 (1984).

There was no abuse of discretion in the District Court's disqualification of Greenberg. The Court recognized that different and potentially conflicting defenses were available to each co-defendant. Indeed, Haziz's primary argument is that he was less culpable than his co-defendant brother because he "was merely carrying out [his] instructions." There can be little doubt that this "blame the co-defendant" strategy created a potentially serious conflict of interest, and Wittels conceded as much when he said that "no workable 'Chinese Wall' could be erected in what is a four lawyer firm in which the offices of counsel in this case are adjacent to one

---

[5] The law makes no distinction between one lawyer and multiple lawyers from the same firm representing co-defendants. *See* Fed. R. Crim. P. 44(c) ("Joint representation occurs when . . . the defendants are represented by the same counsel, or counsel who are associated in law practice.").

10

another and in which there is a common receptionist."

Haziz asserts, however, that "the possibility of a conflict is not sufficient to disqualify appellant's counsel of choice." The case law says otherwise, and says so emphatically. In *Wheat*, the leading case in this area, the Supreme Court explicitly stated that the presumption in favor of a defendant's counsel of choice "may be overcome not only by a demonstration of actual conflict but by a showing of a serious potential for conflict." 486 U.S. at 164. This is necessary, the Court explained, because district courts are required to evaluate possible conflicts in the "murkier pretrial context when relationships between parties are seen through a glass, darkly." *Id.* at 162. As such, the Court held that district courts must be given "substantial latitude" to take protective steps "not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict as the trial progresses." *Id.* at 163. Our decisions are, of course, in accord. *See*, *e.g.*, *Voigt*, 89 F.3d at 1075 ( "Clearly, the potential for serious conflicts is a consideration of judicial administration that can outweigh a defendant's right to counsel of choice.").

Nor did Wittels' withdrawal from the case cure the problem. The District Court found that a serious potential conflict exists "if Mr. Greenberg retains any loyalty to his firm's former client." Indeed, this concern had some basis in fact in light of Greenberg's puzzling decision not to oppose Rahmmar's motion for a continuance despite having represented to the Court that Haziz wished to proceed to trial immediately. In *Flanagan*, we considered whether a firm that had been disqualified from representing several co-defendants should have been permitted to continue representing just one of the defendants. 679 F.2d at 1076. In affirming the district court's disqualification of the entire firm, we explained that "[t]he potential for conflict arising from the firm's receipt of confidential information from all the defendants, and its obligations in defending just one of the defendants, perhaps at the expense of the others, is obvious." *Id.*; *see also* Pa. Rules of Prof'l Conduct 1.7 (stating that a conflict exists where

11

"there is a significant risk that the representation . . . will be materially limited by the lawyer's responsibilities to . . . *a former client*") (emphasis added). Given the foregoing, and even though Rahmmar had become a former client of the firm, the Court did not abuse its discretion in determining that a serious potential for conflict remained and that Greenberg should be disqualified.

## B. Denial of Mistrial

Haziz next argues that the District Court abused its discretion in denying him a mistrial. As described above, Haziz's motion for a mistrial was prompted by the testimony of his niece, Devinearth Freeman, who twice made unsolicited mention of the fact that Haziz was "already in jail" in response to the prosecutor's questions. After the jury had been excused for the day, defense counsel moved for a mistrial, alleging prejudice. The Court denied the motion, but stated: "[D]o you want a cautionary instruction? . . . I will give it tomorrow morning after you consult with the Government, assuming it's a reasonable cautionary, I'll be happy to give it." Defense counsel agreed and drafted the following instruction, which the Court read to the jury the next morning: "Ladies and gentlemen, I'm instructing you to disregard, from your consideration, any testimony which might have discussed the custody status of Mr. Haziz Self."

We review a district court's denial of a mistrial for abuse of discretion. *United States v. Hakim*, 344 F.3d 324, 328 (3d Cir. 2003). There is no dispute that Freeman's mention of the fact that Haziz was "already in jail" was improper. However, "[a] mistrial is not required where improper remarks were harmless, considering their scope, their relation to the context of the trial, the ameliorative effect of any curative instructions and the strength of the evidence supporting the conviction." *United States v. Rivas*, 493 F.3d 131, 140 (3d Cir. 2007). Here, Freeman's statements were brief, isolated, and unsolicited by the prosecutor. As such, when viewed in the context of the entire trial, their impact was negligible—especially considering the very strong evidence adduced by the government. Moreover, out of an

12

abundance of caution, the District Court instructed the jury to disregard any testimony as to Haziz's custody status, the instruction defense counsel requested. In light of the principle that a jury is presumed "to disregard inadmissible evidence inadvertently presented to it," *Greer v. Miller*, 483 U.S. 756, 766 n.8 (1978), this instruction neutralized the prejudice—if any—from Freeman's two improper responses. The Court did not abuse its discretion in denying Haziz's motion for a mistrial.

## C. Allegations by Alternate Juror

Haziz argues, next, that he is entitled to a new trial because the District Court abused its discretion in denying his request to conduct a post-trial interview of an alternate juror. As noted above, the alternate juror—who did not participate in jury deliberations—approached a courtroom deputy after the verdict had been returned and reported that "'several' of the regular jurors had told her that they went along with the verdict even though they did not necessarily agree with it." The Court related this exchange to counsel, and defense counsel requested permission to interview the alternate juror, a request that the Court denied.

We review for abuse of discretion a district court's handling of allegations of irregularities in jury deliberations. *United States v. Stansfield*, 101 F.3d 909, 914 (3d Cir. 1996). At the outset, we note that post-trial interviews of discharged jurors are generally disfavored, as we are "'always reluctant to haul jurors in after they have reached a verdict in order to probe for potential instances of bias, misconduct or extraneous influences.'" *United States v. Gilsenan*, 949 F.2d 90, 97 (3d Cir. 1991) (quoting *United States v. Ianniello*, 866 F.2d 540, 543 (2d Cir. 1989)); *see also* 3-606 *Weinstein's Federal Evidence* § 606.06 (2011) ("The federal courts are notoriously reluctant to permit either informal post-verdict interviews with or testimony from discharged jurors."). This reluctance to allow post-trial questioning of jurors stems from a recognition that "post-verdict inquiries may lead to evil consequences: subjecting juries to harassment, inhibiting juryroom deliberation, burdening courts with meritless

13

applications, increasing temptation for jury tampering and creating uncertainty in jury verdicts." *Gilsenan*, 949 F.2d at 97 (citation and internal quotations omitted). Surely, then, post-verdict inquiries of alternate jurors who never participated in deliberations, much less in return of the verdict, should be given short shrift, indeed.

We need not reprise the District Court's careful consideration of defense counsel's request to interview the alternate juror. Suffice it to say that all Haziz argues to us is that questioning the alternate juror "would have been proper to determine if any outside influence [was] improperly brought to bear [sic] upon any juror." But nowhere did the alternate juror even suggest that there had been any outside influence on any juror. At best, and we stress at *best*, the alternate juror's statement suggests only that some jurors may have persuaded others to set aside their misgivings and vote to convict. The District Court did not abuse its discretion in denying Haziz's request.

## D. Guidelines Calculations

Haziz raises two arguments related to the calculation of his guideline sentencing range. First, he argues that he was entitled to a downward adjustment for a "mitigating role" pursuant to U.S.S.G. § 3B1.2. Second, he argues that his offense level should have reflected only the weight of one of the two baggies of crack, because only one baggie was actually tested by the drug lab. The District Court considered and rejected both of these arguments.[6] We review its findings for clear error. *United States v. Isaza-Zapata*, 148 F.3d 236, 237 (3d Cir. 1998); *United States v. Yeung*, 241 F.3d 321, 322 (3d Cir. 2001).

---

[6] The District Court noted that these arguments were academic in light of the applicable mandatory minimum sentence. As discussed below, however, Haziz is not subject to a mandatory minimum, and so it is necessary for us to address the arguments he makes as to the guidelines calculations.

14

## 1. "Mitigating Role" Adjustment

Haziz portrays himself to us as a loyal—albeit hard-luck—brother whose crime resulted only from the desire to help out a wayward sibling. In keeping with this theme, Haziz argues that the District Court committed clear error when it declined to grant him a discretionary "mitigating role adjustment" under the guidelines. *See* U.S.S.G. § 3B1.2. At sentencing, the Court stated: "I don't think a reduction or a departure . . . is warranted. . . . I have the discretion to grant it, but I choose not to grant it based on the evidence that was presented at trial." This determination was not clearly erroneous.

The guidelines permit the downward adjustment of a defendant's offense level if the defendant was "substantially less culpable than the average participant." U.S.S.G. § 3B1.2 cmt. n.3. Specifically, the "mitigating role adjustment" provision states:

> Based on the defendant's role in the offense, decrease the offense level as follows:
>       (a) If the defendant was a minimal participant in any criminal activity, decrease by 4 levels.
>       (b) If the defendant was a minor participant in any criminal activity, decrease by 2 levels.
>       In cases falling between (a) and (b), decrease by 3 levels.

U.S.S.G. § 3B1.2. In determining whether this adjustment is warranted, we have instructed district courts to consider "such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *United States v. Headley*, 923 F.2d 1079, 1084 (3d Cir. 1991) (citation and internal quotations omitted). We have also observed that "[t]he district courts are allowed broad discretion in applying this section, and their rulings are left largely undisturbed by

15

the courts of appeal." *Isaza-Zapata*, 148 F.3d at 238.

Haziz points out that it was his brother, Rahmmar, who spoke to the CI and set up the drug deal, and repeatedly asserts that he "was merely carrying out the instructions of his co-defendant brother." As such, Haziz characterizes his involvement in the offense as "simply receiving the payment for a previously negotiated transaction," and stresses that he told the CI that he "[doesn't] do this anymore."

Even accepting this as true, it cannot be said that the District Court erred, much less clearly erred, in denying Haziz a mitigating role adjustment. Haziz did not indirectly further a criminal activity or further that activity in some minor way; to the contrary, he directly engaged in the very act at the heart of the criminal enterprise—namely, the distribution of drugs in exchange for money. Thus, under the *Headley* factors set forth above, "the importance of [his] actions to the success of the venture" could not be clearer. *Headley*, 923 F.2d at 1084. Additionally, the fact that Haziz was trusted to handle the distribution of wholesale quantities of drugs worth hundreds of dollars speaks to the remaining *Headley* factors: his relationship with the other members involved in the criminal enterprise and his knowledge of the nature and scope of the venture. *See Isaza-Zapata*, 148 F.3d at 241 ("[T]he amount of drugs with which the defendant is charged may be an important factor which weighs heavily in the court's view of the defendant's relative culpability."). While there may well be two permissible views as to whether the evidence supports a mitigating role adjustment, "the factfinder's choice between them cannot be clearly erroneous." *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985).

2. Weight of Drugs

Mr. Varughese, the government's forensic chemist, testified that in accordance with standard lab procedures, he tested the contents of only one of the two baggies purchased by the CI from Haziz in the arranged drug transaction. Seizing on this fact, Haziz argues that he should only be held responsible for the weight of the crack in the tested baggie

(5.494 grams), not the total weight of both baggies (12.05 grams). At sentencing, the District Court determined that "the calculation was appropriate at 12.05 grams." The Court did not clearly err in reaching this conclusion.

The government bears the burden of proving the weight of the drugs involved in an offense by a preponderance of the evidence. *United States v. McCutchen*, 992 F.2d 22, 25 (3d Cir. 1993). When a defendant "challenges a drug quantity estimate based on an extrapolation from a test sample, the government must show, and the court must find, that there is an adequate basis in fact for the extrapolation and that the quantity was determined in a manner consistent with accepted standards of reliability." *Id.* at 25-26. This does not, however, require the government to adduce any sort of statistical evidence; rather, "reasonable reliability is the touchstone of the determination." *Id.* at 26.

Haziz simply recites this "reasonable reliability" standard and offers a conclusory statement that the standard was not met. The record, however, shows otherwise. Although Varughese tested only one of the two bags of suspected crack, he explained that this was standard and accepted procedure for the Philadelphia Police Department: "[A]ccording to our lab policy, we are analyzing only 10 percent of the exhibit we are submitted . . . . [T]hat same policy [applies] for every case we are getting."[7] Varughese emphasized that the police lab was fully accredited and that, in order to maintain accreditation, it "need[s] to show for each and every case [the] same procedures," regardless of the number of items submitted for testing. Additionally, he testified that the baggies purchased by the CI had a similar appearance, size, and packaging. Finally, the fact that the CI agreed to buy one-half ounce (about fourteen grams) of crack

---

[7] For example, if one thousand small packets are submitted for testing, the lab analyzes one hundred packets. Varughese went on to explain that if the lab gets sixteen bags (which it rounds up to twenty), it analyzes two. If only fourteen bags are submitted (which it rounds down to ten), the lab analyzes only one.

gives rise to a strong inference that the 12.05 grams of chunky white substance in the two baggies was crack cocaine, even without the fact, and fact it be, that the two baggies were purchased from the same source in the same transaction. In light of the use of an established testing procedure, the similar size and appearance of the packages, and the incriminating circumstances of the transaction, the weight calculation was reasonably reliable. As such, the District Court's determination of the quantity of drugs involved in the offense was not clearly erroneous.

## E. Fair Sentencing Act

Finally, Haziz argues that we should vacate his sentence and remand for a *de novo* resentencing in light of the Fair Sentencing Act of 2010 ("FSA"). The FSA, which was aimed at reducing sentencing disparity between crack cocaine and powder cocaine offenses, raised the amount of crack that triggered a mandatory minimum sentence from five grams to twenty-eight grams. Fair Sentencing Act of 2010, Pub. L. 111-220, § 2, 124 Stat. 2372, 2372 (2010). Because Haziz's offense involved approximately twelve grams of crack, he fell within the class of offenders who stood to benefit from this change in law. However, although the FSA already had been signed into law at the time of sentencing, the government argued that it should not apply because Haziz had been convicted prior to its enactment. The District Court agreed, and Haziz was thus subjected to a ten-year mandatory minimum sentence, which was duly imposed.

A few months after sentencing, however, we decided *United States v. Dixon*, 648 F.3d 195 (3d Cir. 2011). We held in *Dixon* that the FSA applies to all defendants sentenced after its enactment, regardless of whether their offenses and convictions predated its passage. In light of *Dixon*, the government concedes that "the appropriate remedy is to vacate [Haziz's] sentence and remand the case for a *de novo* resentencing proceeding." We agree, and will vacate the sentence and remand for resentencing in accordance with the provisions of the FSA.

18

## IV. Conclusion

For the foregoing reasons, we will affirm the convictions but will vacate the sentence and remand for resentencing.