**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-1297
_____

UNITED STATES OF AMERICA

v.

SCHIRMER MONESTIME
                              Appellant

_____

On Appeal from the United States District Court for the
District of New Jersey
(District Court No.:  2-14-cr-00618-001)
District Judge:  Honorable Susan D. Wigenton

_____

Submitted under Third Circuit L.A.R. 34.1(a)
on November 7, 2016

Before:  JORDAN, GREENAWAY, JR., and RENDELL, <u>Circuit Judges</u>

(Opinion Filed:  January 27, 2017)

_____

O P I N I O N*
_____

**RENDELL,** <u>Circuit Judge</u>,

---

  * This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7
does not constitute binding precedent.

This appeal stems from a drug-trafficking conspiracy that took place in Elizabeth, New Jersey, from January through March of 2013. Three individuals were caught in the operation: Bobby Lewis, who pled guilty, Joseph "Clifford" Jacques, who got away, and Appellant Schirmer Monestime, who was convicted by a jury for one count of drug-trafficking conspiracy in violation of 21 U.S.C. §§ 841 and 846. The District Court subsequently sentenced Monestime to 63 months' imprisonment and three years' supervised release. By this appeal, Monestime argues that the District Court committed three errors by: (1) denying Monestime's pre-trial motion to suppress evidence; (2) denying Monestime's post-trial motion for a judgment of acquittal or, in the alternative, a new trial; and (3) denying Monestime a mitigating role adjustment during sentencing. For the reasons explained below, we will affirm the District Court's ruling as to all three of Monestime's claims.

I.

The following sequence of events came to light through testimony at Monestime's suppression hearing and trial.

In January 2013, Jacques offered Lewis $500 to accept a package mailed from Haiti to Elizabeth, New Jersey. Lewis, who did not specifically know that the package was supposed to contain nearly three kilograms of cocaine, agreed on the condition that the package be sent to a different person's attention at a building where Lewis's aunt lived. Jacques later notified Lewis that the package would be delivered in mid-February. A Government investigation found that Jacques also notified Monestime, who had

accepted Jacques's offer to be a "contractor" for the package. The package was ultimately returned to Haiti because Lewis did not arrive at the mailing address in time.

Later in February, Jacques told Lewis that the package was being reshipped, and they agreed that this time it would be sent to Lewis's attention at his aunt's address. But when the package reached the Port of Miami, U.S. Customs and Border Protection ("CBP") officials discovered that it contained six framed paintings with cocaine secreted inside the frames. The CBP officials alerted Department of Homeland Security Investigations ("HSI") agents based in Newark, New Jersey, about the discovery, and the HSI agents decided to set up a controlled delivery to the original destination in Elizabeth. When the package arrived in Newark, HSI agents retrieved nearly three kilograms of cocaine and constructed new frames for the paintings that they packed with fake cocaine. The agents then planned the controlled delivery of the package to Lewis's aunt's address in Elizabeth, with over 15 agents assigned to the area to conduct surveillance.

On March 4, 2013, Monestime drove Jacques, who was seated in the front passenger seat, to pick up Lewis, and the three of them continued to Lewis's aunt's address in Elizabeth, where Lewis was dropped off to wait for the package. Lewis testified that he retrieved the package (unaware that the mail carrier was actually an undercover postal inspector) and, following Jacques's instructions, walked with it to a nearby Bank of America parking lot after unwittingly passing surveilling agents along the way. Once at the parking lot, Lewis called Jacques to let him know where he was, and Monestime, still with Jacques, drove to him. Lewis waved toward them when they arrived, and Monestime and Jacques circled the parking lot. They then exited the bank

3

parking lot, driving past Lewis and an unmarked van of law enforcement agents. One of those agents, James McDermott, testified that while in the van, he learned from other surveilling agents in real time about the call and wave. McDermott testified that these events – accepting a package and then immediately bringing it to a parking lot and making a phone call; a car subsequently driving around a bank parking lot without conducting a transaction; the package recipient waving toward that car – had raised his suspicion at the time.

Meanwhile, Lewis left the parking lot and took the package back to his aunt's home. The agents drove after Monestime and Jacques. Monestime testified that Jacques then asked him to pull over, at which point Jacques exited, his cell phone fell on the ground, and Jacques fled. Though McDermott did not see Jacques exit the car, he testified that he saw the door on the front passenger's side open and close, making him suspicious that someone had fled on foot. The agents then drove closer to Monestime, who immediately drove away, making several consecutive turns. McDermott testified that Monestime's driving signaled to him and the other agents that Monestime was engaging in counter-surveillance, prompting them to pull Monestime over and order him out of his vehicle.

McDermott also testified that after the stop but before the arrest, he saw in plain view in the console a cell phone that appeared to be missing its battery and SIM card, a counter-surveillance tactic that McDermott testified is often employed by individuals in narcotics investigations. Monestime, according to McDermott's testimony, told McDermott that the cell phone was his but had been in the car for months and that he had

4

not used it that day. McDermott testified that Monestime told him he worked at a nearby YMCA but did not have his work ID, and that he asked Monestime about his Haitian nationality because when trafficking drugs, people "typically" receive packages from their country of origin. Agent McDermott next arrested Monestime, searched the cell phone for recent calls and contacts, and brought Monestime to HSI headquarters in Newark for processing. Monestime later told McDermott, and ultimately testified, that the cell phone actually belonged to Jacques.

After interviewing Monestime at the station, Agent McDermott showed Monestime a photo array that contained photographs of six men, one of whom was named Clifford Jacques but was not the Jacques who had fled from Monestime's van in the parking lot. Monestime circled that man's photograph and (mis)identified him as Jacques. The same day it realized the error, the Government alerted Monestime that the man he had selected was not his co-conspirator.

A federal grand jury indicted Monestime on a single count of drug-trafficking conspiracy in violation of 21 U.S.C. §§ 841 and 846. Monestime timely moved to suppress his post-arrest statements and the evidence seized from him and his vehicle, particularly the cell phone, arguing that they were the fruits of an illegal arrest. The District Court denied Monestime's suppression motion.

A jury convicted Monestime following a four-day trial, and Monestime timely moved for a judgment of acquittal or a new trial. The District Court denied that motion. At sentencing, Monestime objected to the sentencing range calculated in the Presentence Report and argued that he was entitled to a two-level mitigating role reduction.

5

Monestime emphasized his role in the conspiracy relative to Lewis's because Lewis had received a two-level mitigating role reduction when sentenced by another judge. The District Court overruled Monestime's objection and sentenced him to 63 months' imprisonment and three years' supervised release. Monestime timely appealed.

II.

We now turn to Monestime's three claims.[1]

## A. Motion to Suppress

Monestime's motion to suppress averred that McDermott lacked probable cause to arrest him and reasonable suspicion to stop him. Therefore, Monestime argued, all of his post-arrest statements and all of the evidence seized from him and from his car should have been suppressed. Monestime reiterates these arguments on appeal, adding that the District Court applied the wrong standard in finding the arrest lawful. Appellant's Br. 22. We disagree.

We review the District Court's denial of a motion to suppress for clear error as to the underlying factual findings and exercise plenary review of its application of the law to those facts. *United States v. Perez*, 280 F.3d 318, 336 (3d Cir. 2002). "This review is more deferential with respect to determinations about the credibility of witnesses, and when the district court's decision is based on testimony that is coherent and plausible, not

---

[1] The District Court had subject matter jurisdiction under 18 U.S.C. § 3231. This Court has jurisdiction over Monestime's challenge to his conviction pursuant to 28 U.S.C. § 1291 and over Monestime's challenge to his sentence pursuant to 18 U.S.C. § 3742(a).

internally inconsistent and not contradicted by external evidence, there can almost never be a finding of clear error." *United States v. Igbonwa*, 120 F.3d 437, 441 (3d Cir. 1997).

The Fourth Amendment requires that probable cause support a warrantless arrest. U.S. Const. amend. IV; *see also Devenpeck v. Alford*, 543 U.S. 146, 152 (2004) ("[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed."). "Probable cause to arrest exists when the information within the arresting officer's knowledge at the time of the arrest is sufficient to warrant a reasonable law enforcement officer to believe that an offense has been or is being committed by the person to be arrested." *Paff v. Kaltenbach*, 204 F.3d 425, 436 (3d Cir. 2000). The contours of the probable cause standard are well-established: it is a "practical, nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act. . . . [It] is a fluid concept—turning on the assessment of probabilities in particular factual contexts— not readily, or even usefully, reduced to a neat set of legal rules." *Maryland v. Pringle*, 540 U.S. 366, 370–71 (2003) (citations and quotation marks omitted). "While probable cause to arrest requires more than mere suspicion, the law recognizes that probable cause determinations have to be made 'on the spot' under pressure and do 'not require the fine resolution of conflicting evidence that a reasonable doubt or even a preponderance standard demands.'" *Kaltenbach*, 204 F.3d at 436 (quoting *Gerstein v. Pugh*, 420 U.S. 103, 121 (1975)). Importantly, probable cause assesses "not whether particular conduct

7

is 'innocent' or 'guilty,' but the degree of suspicion that attaches to particular types of non-criminal acts." *Illinois v. Gates*, 462 U.S. 213, 243 n.13 (1983).

Even without probable cause, "an officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot." *United States v. Valentine*, 232 F.3d 350, 353 (3d Cir. 2000). "Reasonable suspicion is a less demanding standard than probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

We find that the District Court applied the correct standard when assessing Monestime's warrantless arrest, and agree that McDermott had probable cause to arrest Monestime.[2] The District Court correctly noted that "the standard to determine whether probable cause existed is certainly not beyond that of a reasonable doubt, which is what a trial would require." S.A. 73; *see also Pringle*, 540 U.S. at 371 ("Finely tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision." (second alteration in original) (citation omitted)). It also correctly acknowledged its obligation "to look at the totality of the

---

[2] Though the District Court considered McDermott's *post-stop* observation of the cell phone in finding probable cause, we note that there may well have been probable cause even before that based on Monestime's counter-surveillance driving tactics. *See United States v. Frost*, 999 F.2d 737, 743–44 (3d Cir. 1993) (finding probable cause where defendant "acted furtively," "employed counter-surveillance techniques," and "became nervous when engaged in conversation by two detectives" even though drug-sniffing dogs did not alert to defendant's suitcase); *see also United States v. Soto*, 375 F.3d 1219, 1222 (10th Cir. 2004) ("[E]vidence of counter-surveillance may support a finding of probable cause."); *United States v. Payne*, 119 F.3d 637, 642–43 (8th Cir. 1997); *United States v. Ocampo*, 937 F.2d 485, 490 (9th Cir. 1991); *cf. United States v. Martinez-Molina*, 64 F.3d 719, 729 (1st Cir. 1995).

8

circumstances" and "[w]hat the officers knew at the time of the stop, and the arrest." S.A. 73.

Assessing McDermott's testimony at the pre-trial suppression hearing, the District Court found that "what the officers could have reasonably believed at the time is also supported by the testimony given by Agent McDermott, which is that [he] believed that [Monestime] was doing evasive maneuvers and that he had in fact detected that he was being followed by law enforcement." S.A. 75. The District Court appropriately considered McDermott's post-stop observation of the cell phone – finding that "it was certainly valid that in [McDermott's] training and experience, it was consistent with a person who's possibly looking to avoid detection and/or somehow to avoid being linked to some type of activity" – before concluding that "there was probable cause for the arrest." *Id.* at 75–76. The information that McDermott personally observed and learned in real time following the controlled delivery established more than enough probable cause for McDermott to arrest Monestime, let alone sufficient reasonable and articulable suspicion to stop him.[3]

As the District Court noted, the only basis Monestime alleges for suppressing his post-arrest statements is the arrest itself. *Id.* at 76. Because we find that Agent McDermott had probable cause to arrest Monestime, that claim also fails.

---

[3] Though Monestime rebuts McDermott's suspicions with explanations of his behavior, he cannot overcome the well-settled principle that "[a] determination that reasonable suspicion exists . . . need not rule out the possibility of innocent conduct." *United States v. Arvizu*, 534 U.S. 266, 277 (2002); *see also United States v. Ubiles*, 224 F.3d 213, 217 (3d Cir. 2000) ("A reasonable suspicion of criminal activity may be formed by observing exclusively legal activity.").

9

We disagree with Monestime that the District Court should have suppressed all evidence obtained from McDermott's warrantless search of the recent calls and contacts on the cell phone found on the console.[4]  Though the Supreme Court held in *Riley v. California* that "a warrant is generally required . . . even when a cell phone is seized incident to arrest," 134 S. Ct. 2473, 2493 (2014), that decision was issued over a year after the search at issue in this case.  At the time of his search, McDermott relied in good faith on then-agency practice to "search incident to arrest any phones to determine if there [were] other co-conspirators in the area, and . . . to know anybody that [had] been communicated with regarding the delivery."  S.A. 28–29; *cf. United States v. Katzin*, 769 F.3d 163, 182 (3d Cir. 2014) (en banc) (concluding that when agents act "upon an objectively reasonable good faith belief in the legality of their conduct," the good faith exception to the exclusionary rule applies).  Alternatively, the independent source doctrine cuts against suppression:  the Government eventually obtained a search warrant for the cell phone, and there has been no showing that the initial warrantless search affected the warrant application.  *See United States v. Stabile*, 633 F.3d 219, 243 (3d Cir. 2011).

---

[4] We question Monestime's standing to bring his claim about that cell phone in the first instance.  Monestime said during the suppression hearing and at trial that the cell phone was not his.  McDermott testified that Monestime told him he did not use the cell phone on the day in question, and that it had been in the vehicle for months.  Monestime therefore does not have a Fourth Amendment-protected interest in this cell phone.  *See United States v. Padilla*, 508 U.S. 77, 81 (1993) (per curiam) ("It has long been a rule that a defendant can urge the suppression of evidence obtained in violation of the Fourth Amendment only if that defendant demonstrates that *his* Fourth Amendment rights were violated by the challenged search or seizure."); *see also Alderman v. United States*, 394 U.S. 165, 174 (1969) (Fourth Amendment rights "may not be vicariously asserted.").

Accordingly, we affirm the District Court's denial of Monestime's pre-trial suppression motion in its entirety.

**B. Motion for Judgment of Acquittal or a New Trial**

Following his guilty verdict, Monestime moved for a judgment of acquittal under Fed. R. Crim. P. 29(a) or, in the alternative, a new trial under Fed. R. Crim. P. 33. The District Court denied the motion, and we affirm. Monestime urges that the Government fabricated evidence in the course of its investigation. We need not revisit this argument at length.

We exercise plenary review over a district court's grant or denial of a Rule 29 motion, applying the same standard as the District Court. *See United States v. Salahuddin*, 765 F.3d 329, 348 (3d Cir. 2014). In doing so, we "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt based on the available evidence." *Id*. (alteration in original) (citation omitted). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *Id*. (citation omitted). We review a district court's denial of a Rule 33 motion for abuse of discretion. *Id*. at 346.

Both Rules 29 and 33 set forth particularly difficult standards. Under Rule 29, "only when the record contains no evidence, regardless of how it is weighted, from which the jury could find guilt beyond a reasonable doubt, may an appellate court overturn the verdict." *United States v. Syme*, 276 F.3d 131, 156 (3d Cir. 2002) (citation omitted). Under Rule 33, the District Court "can order a new trial on the ground that the jury's

11

verdict is contrary to the weight of the evidence only if it believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted." *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (citation and quotation marks omitted).

Monestime uses the Government's error in compiling the photo array to contend that "federal agents fabricated evidence in the course of its investigation." Appellant's Br. 25. He argues that the Government's "blatant fabrication of evidence tainted [its] entire case and called in to serious question the integrity of any remaining evidence within the custody and control of the investigating agents." *Id.* at 26. As the District Court noted, such arguments "relat[ing] to some type of manipulation of evidence" were "raised at the time of trial" and "could have been and more than likely were considered by the jury." S.A. 519; *see also Salahuddin*, 765 F.3d at 348 ("[Defendant's] arguments about credibility and challenges to portions of the Government's evidence were made to the jury, who were free to reject them."). Accordingly, we affirm the District Court's denial of the motion.

**C. Sentencing**

Lastly, Monestime contests the District Court's calculation of his sentencing range under the Guidelines, arguing that he was entitled to a two-point reduction for a minor role pursuant to U.S.S.G. § 3B1.2(b). The District Court considered and rejected this argument. We review that finding for clear error. *United States v. Self*, 681 F.3d 190, 200 (3d Cir. 2012). "A decision is clearly erroneous if the reviewing court is left with the definite and firm conviction based on all the evidence that the trial court made a

12

mistake[,]" *United States v. Perez*, 280 F.3d 318, 351 (3d Cir. 2002), but "[w]here there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *United States v. Waterman*, 755 F.3d 171, 174 (3d Cir. 2014) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 574 (1985)). We find that the District Court's determination was not clearly erroneous.

The Sentencing Guidelines permit the downward adjustment of a defendant's offense level if the defendant was "substantially less culpable than the average participant in the criminal activity." U.S.S.G. § 3B1.2 cmt. n.3. Specifically, the Mitigating Role provision states in relevant part: "If the defendant was a minor participant in any criminal activity, decrease by 2 levels." U.S.S.G. § 3B1.2(b). "In determining whether this adjustment is warranted, we have instructed district courts to consider such factors as the nature of the defendant's relationship to other participants, the importance of the defendant's actions to the success of the venture, and the defendant's awareness of the nature and scope of the criminal enterprise." *Self*, 681 F.3d at 201 (citation and quotation marks omitted). "We have also observed that '[t]he district courts are allowed broad discretion in applying this section, and their rulings are left largely undisturbed by the courts of appeal.'" *Id.* (quoting *United States v. Isaza-Zapata*, 148 F.3d 236, 238 (3d Cir. 1998)).

Lewis, the co-conspirator who pled guilty and testified against Monestime, received a two-level mitigating role reduction under U.S.S.G. § 3B1.2(b) when sentenced by another judge. In his brief, Monestime emphasizes a number of similarities between himself and Lewis, and aims to establish that he was not "any more aware of the scope

13

and structure of the conspiracy than Lewis[,]" ultimately concluding that "[t]he only real difference [between the two men] is that Lewis pled guilty and [Monestime] elected to go to trial." Appellant's Br. 29–30. Even accepting Monestime's argument that he and Lewis were equally culpable – or that Monestime was less culpable – it cannot be said that the District Court erred, much less clearly erred, in denying Monestime a mitigating role adjustment.[5] "[T]he mere fact that a defendant was less culpable than his co-defendants does not entitle the defendant to 'minor participant' status as a matter of law." *United States v. Brown*, 250 F.3d 811, 819 (3d Cir. 2001). Monestime has neither made any showing that he was "substantially" less involved than Lewis, U.S.S.G. § 3B1.2 cmt. n.3, nor left us with the "definite and firm conviction based on all the evidence that the trial court made a mistake." *Perez*, 280 F.3d at 351. Accordingly, we affirm the District Court's sentence.

## III.

In summary, for all of the foregoing reasons, we will affirm the District Court's denial of Monestime's pre-trial motion to suppress evidence; denial of Monestime's motion for a judgment of acquittal or, in the alternative, a new trial; and denial of a mitigating role adjustment during sentencing.

---

[5] We agree with the District Court's observation during sentencing that Monestime's explanations for his incriminating behavior "strain[] credibility." S.A. 539. In any event, "the District Court is under no obligation to accept as true the defendant's own characterization of his role in the criminal scheme" or "attribute to them any particular evidentiary weight." *United States v. Rodriguez*, 342 F.3d 296, 299, 300 n.5 (3d Cir. 2003).

14