PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
—————

No. 13-1464
—————

UNITED STATES OF AMERICA

v.

RONALD SALAHUDDIN,
                    Appellant

—————

No. 13-1751
—————

UNITED STATES OF AMERICA

v.

SONNIE L. COOPER,
                    Appellant

—————

On Appeal from the United States District Court
for the District of New Jersey
(D. N.J. Nos. 3-10-cr-00104-001 & 3-10-cr-00104-002)
District Judge: Honorable Freda L. Wolfson

———

Argued June 10, 2014
Before: FISHER, COWEN and TASHIMA,[*] *Circuit Judges*.

(Filed: September 3, 2014)

Thomas R. Ashley, Esq.  [ARGUED]
Ashley & Charles
50 Park Place
Suite 1400
Newark, NJ 07102
        *Attorney for Appellant in No. 13-1464*

Alan L. Zegas, Esq.  [ARGUED]
552 Main Street
Chatham, NJ 07928
        *Attorney for Appellant in No. 13-1751*

Mark E. Coyne, Esq.

---

[*]The Honorable A. Wallace Tashima, Senior Circuit Judge for the Ninth Circuit Court of Appeals, sitting by designation.

2

David W. Feder, Esq. [ARGUED]
Office of United States Attorney
970 Broad Street
Room 700
Newark, NJ 07102
    *Attorneys for Appellee*

—————

OPINION

—————

FISHER, *Circuit Judge*.

Appellant Ronald Salahuddin ("Salahuddin") was the Deputy Mayor for Public Safety in Newark, New Jersey. During his time in public office, he allegedly conspired to use his official position to obtain charitable and political contributions and to direct Newark demolition contracts to Appellant Sonnie Cooper ("Cooper"), with whom Salahuddin was allegedly in business. Salahuddin and Cooper were convicted of conspiring to extort under color of official right, in violation of the Hobbs Act, 18 U.S.C. § 1951(a).

Salahuddin and Cooper each raise an array of issues on appeal, none of which overlap. Salahuddin raises issues with the jury instructions and the proofs required for conviction under the Hobbs Act. Cooper raises issues with the weight and sufficiency of the evidence supporting the jury verdict and the Government's alleged selective prosecution and

3

outrageous conduct in its investigation and prosecution. We will affirm both Salahuddin's and Cooper's convictions.

I.

A.

Salahuddin was the Deputy Mayor for Public Safety in the City of Newark, New Jersey under the administration of then-Mayor Cory Booker. Cooper owned and operated a number of stores and businesses in Newark, including S. Cooper Brothers Trucking ("Cooper Brothers"), a demolition business. Cooper Brothers was qualified to receive demolition work from Newark under the city's minority set-aside policy, but was ineligible for other demolition work.

Evidence introduced at trial suggests that Salahuddin was a "silent partner" in Cooper's demolition business. In 2004, Salahuddin gave Cooper money and mortgaged his home and rental property so that Cooper Brothers could pledge sufficient collateral to obtain a performance bond that was a prerequisite for a garbage contract in Irvington, New Jersey. Salahuddin also served as a general indemnitor for the bond. These mortgages remained in effect through the time frame relevant to the conspiracy. Salahuddin gave money to Cooper for Cooper Brothers-related litigation and expenses. Salahuddin helped Cooper generally in running the business and facilitated obtaining an overdue payment from the City of Newark soon after becoming Deputy Mayor. The two occasionally referred to one another as business partners. Salahuddin did not disclose his financial involvement with Cooper Brothers. Nor did Cooper disclose Salahuddin's involvement on licensing forms filed with the state on behalf of Cooper Brothers.

In July of 2006, Salahuddin met with Joseph Parlavecchio ("Parlavecchio"), a Newark political operative.

4

Parlavecchio served as a consultant for several Newark demolition companies. One of these companies belonged to Nicholas Mazzocchi ("Mazzocchi"), a Newark businessman. Mazzocchi's company had retained Parlavecchio as a consultant to help obtain demolition work from Newark, because despite being the largest demolition contractor in New Jersey, Mazzocchi's company had not obtained demolition work from Newark for five years. Unbeknownst to Parlavecchio, Salahuddin, and Cooper, Mazzocchi was cooperating with the F.B.I. as an informant. He had agreed to work with the F.B.I. in April of 2006 – before this alleged conspiracy began – in order to avoid prosecution for bribery and tax-evasion. He recorded numerous meetings and telephone conversations with Salahuddin and Cooper. These recordings were introduced at trial and comprised the bulk of the evidence against the two.[1]

Despite the fact that Salahuddin had no official power over the awarding of demolition contracts, Salahuddin and Parlavecchio discussed dividing the Newark demolition work between Mazzocchi, Cooper Brothers, and another demolition company for which Parlavecchio worked. Parlavecchio recounted the agreement that he and Salahuddin had discussed to Mazzocchi, stating that Mazzocchi could obtain demolition work in Newark from Salahuddin if he promised to give Cooper some work once in a while.

Mazzocchi met with Cooper individually and with both Cooper and Salahuddin several times. They solidified their understanding of the plan, whereby Salahuddin would use his political influence to steer demolition work to

---

[1] Parlavecchio was involved in discussions leading to the alleged conspiracy in the beginning, but he was not charged as a member of the conspiracy.

5

Mazzocchi, who would then give a piece of that work, or subcontract it, to Cooper. Mazzocchi and Cooper acknowledged the need for discretion, because Salahuddin was a "political guy." SA 172. Salahuddin confirmed that he had the power to steer demolition work, stating: "I just tell people this is what we want and that's the way, you know, it can happen." SA 190. Salahuddin summarized the arrangement to Mazzocchi, stating: "I'll take care of, you know, Newark. . . . You'll be back in Newark. . . . And then, you two, when something comes down the pike, you can always call [Cooper] . . . ." SA 202.

To effectuate the conspiracy, Salahuddin urged Newark's Demolition Director Bob Minter – who had responsibility for awarding demolition contracts – to give work to Mazzocchi. Salahuddin told Minter that Mazzocchi was a "friend of the administration," and Minter understood this to mean that he should give work to Mazzocchi. JA 1893-95.

Mazzocchi did offer some demolition work to Cooper. He paid Cooper for some demolition work done at a small carwash. After this work and payment, Salahuddin told Mazzocchi that "we, I appreciate it tremendously." SA 217. A week after this carwash demolition work, Salahuddin agreed to help Mazzocchi collect on a past-due bill with the City of Newark, stating that his help was just part of their "working relationship." SA 224. Additionally, Minter awarded two demolition jobs to Mazzocchi in 2007. Mazzocchi subcontracted some of the work on both of these jobs to Cooper. For one of them, Cooper was paid $5,029. A day after depositing the check, Cooper wrote a check to Salahuddin for $5,000 from the Cooper Brothers' account. The memo line stated: "Repay of Cash Loan." SA 148.

6

In addition to work contracted from the City of Newark, Salahuddin, Cooper, and Mazzocchi discussed prospective demolition work on the new arena for the New Jersey Devils hockey team. Salahuddin proposed that he would suggest to the Devils that Mazzocchi receive the demolition work. While Mazzocchi would get the majority of it, Mazzocchi would subcontract a significant portion of that work to Cooper. Salahuddin told Mazzocchi that Mazzocchi was going to "be the pilot" but "we [he and Cooper] just wanna be on the boat." SA 240-41. Salahuddin tried to keep the Devils arena work private, rather than having a public bid process.

Salahuddin also sought and extracted political and charitable contributions from Mazzocchi to help him influence the demolition contracting process. He explained to Mazzocchi that if Mazzocchi supported these entities, Salahuddin could show other officials that Mazzocchi was helping the city. Mazzocchi made several contributions during the time frame of the conspiracy. He spent $5,000 on a donation to Newark Now – a nonprofit associated with Mayor Booker, $3,000 to purchase a table at a fundraiser for Mayor Booker, $1,000 for a golf outing for Empower Newark – a political action committee, and a total of $3,000 on donations to Empower Newark. Salahuddin advised that Mazzocchi should conceal the source of some of his contributions by having the check come from a secretary or a family member.

B.

On February 18, 2010, a grand jury in Trenton, New Jersey returned a five-count indictment against Salahuddin and Cooper. In Count 1, both were charged with conspiracy to obstruct interstate commerce by extortion under color of

7

official right in violation of the Hobbs Act, 18 U.S.C. § 1951(a). In Count 2, both were charged with attempt to obstruct interstate commerce by extortion under color of official right in violation of the Hobbs Act, 18 U.S.C. § 1951(a), 18 U.S.C. § 2. In Counts 3, 4 and 5, they were charged with violations of 18 U.S.C. § 666(a)(B) and 18 U.S.C. § 2 for knowingly and corruptly soliciting, demanding, accepting and agreeing to accept as bribes things of value to influence and reward Salahuddin's effort to steer Newark demolition contracts to Mazzocchi and Cooper. Count 3 related to contracts that Cooper received. Count 4 charged only Salahuddin for contributions Mazzocchi made at Salahuddin's behest. Count 5 related to the $5,000 payment that Cooper made to Salahuddin shortly after being paid by Mazzocchi for subcontracted work.

Both Salahuddin and Cooper proceeded to trial, which began on September 7, 2011. The Government introduced recorded conversations involving Salahuddin and Cooper made by Mazzocchi, documentary evidence of business records and records of charitable donations, and witness testimony from Mazzocchi and several Newark officials. After the Government rested, Salahuddin called several character witnesses and testified himself. Cooper called no witnesses, but did examine Salahuddin. On October 14, 2011, the jury found Salahuddin and Cooper guilty on Count 1 – conspiracy to commit extortion under color of official right in violation of the Hobbs Act – and not guilty on the remaining counts.

Near the close of the Government's case, Salahuddin and Cooper moved for judgment of acquittal under Federal Rule of Criminal Procedure 29. The District Court deferred ruling on the motion until after trial. In post-trial briefing, they reasserted their claims under Rule 29, requested a new

trial under Federal Rule of Criminal Procedure 33, and challenged the verdict for insufficient jury instructions, selective prosecution, and outrageous government conduct. On July 19, 2012, the District Court denied the post-trial motions.

On February 11, 2013, the District Court sentenced Salahuddin to a term of imprisonment of one year and one day and two years of supervised release, and imposed a $5,000 fine. On March 4, 2013, the District Court sentenced Cooper to a two-year term of supervised release, but no time in prison, and imposed a fine of $3,000. Salahuddin and Cooper filed separate and timely notices of appeal

## II.

The District Court had jurisdiction under 18 U.S.C. § 3231. We have appellate jurisdiction pursuant to 28 U.S.C. § 1291.

## III.

Because Salahuddin and Cooper briefed their appeals separately and raise different issues, we will address them separately. We will address the challenges that Salahuddin raises to his conviction in Part III.A. We will address the challenges Cooper makes to his conviction in Part III.B. We note that Salahuddin joins all of Cooper's arguments, but Cooper has not done the same.

### A. Salahuddin

Salahuddin raises seven issues on appeal. Three of those issues implicate his theory that an overt act is required for a Hobbs Act conspiracy conviction, and we address them together in Part III.A.1. In Part III.A.2, we address Salahuddin's argument that the Hobbs Act conspiracy

9

conviction required proof that a member of the conspiracy obtained benefits. We then address Salahuddin's argument that the conspiracy conviction cannot be sustained based upon Mazzocchi's charitable contributions in Part III.A.3. Finally, we address two issues challenging the jury instructions in Part III.A.4.

Salahuddin did not object to the jury instructions, and, with the exception of the argument that we address in Part III.A.2, he did not raise any of the arguments that he makes in this appeal before the District Court. Therefore, we review his arguments (except his argument that the Hobbs Act conspiracy conviction required proof that a member of the conspiracy obtained benefits) for plain error. In reviewing for plain error, we inquire whether there is "(1) an error; (2) that is plain; and (3) that affected substantial rights." *United States v. Dobson*, 419 F.3d 231, 236 (3d Cir. 2005). An error is plain "if the error is 'obvious' or 'clear under current law.'" *United States v. Vazquez*, 271 F.3d 93, 100 (3d Cir. 2001) (en banc) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). If all three of these conditions are met, "an appellate court may in its discretion grant relief, but only if 'the error seriously affects the fairness, integrity, or public reputation of [the] judicial proceedings.'" *Dobson*, 419 F.3d at 236 (alteration in original) (quoting *United States v. Haywood*, 363 F.3d 200, 206-07 (3d Cir. 2004)).

1.

Salahuddin raises three issues that can be grouped together as a challenge to the Government's failure to prove that one of the alleged co-conspirators committed an overt act in furtherance of the conspiracy. He argues that the District Court erred in omitting an overt act requirement from its jury instructions and that the rule of lenity requires that his

conviction be vacated. He also contends that because the indictment alleged overt acts, the Government's failure to prove these acts constructively amended the indictment. Because Salahuddin failed to object to the jury instructions or raise the constructive amendment issue before the District Court, we review these arguments for plain error. *See United States v. Duka*, 671 F.3d 329, 352 (3d Cir. 2011) (applying plain error review to an unpreserved constructive amendment issue); *United States v. Bansal*, 663 F.3d 634, 643 (3d Cir. 2011) (applying plain error review to an unpreserved statutory interpretation issue); *United States v. W. Indies Transport, Inc.*, 127 F.3d 299, 310 (3d Cir. 1997) (applying plain error review to an unpreserved jury instruction issue).

To address Salahuddin's specific arguments, we must first determine whether an overt act is a required element of Hobbs Act conspiracy. Our Court has not yet ruled on this issue. We look to the Supreme Court's opinions in *United States v. Shabani*, 513 U.S. 10 (1994), and *Whitfield v. United States*, 543 U.S. 209 (2005), as the appropriate framework to use in making this determination. Both cases applied principles of statutory construction to conclude that an overt act was not required under the relevant conspiracy statutes, as the statutory language was silent as to an overt act. In *Shabani*, the Supreme Court considered the drug conspiracy statute, 21 U.S.C. § 846. 513 U.S. at 11. In *Whitfield*, the Court addressed conspiracy to commit money laundering in violation of 18 U.S.C. § 1956(h). 543 U.S. at 211.

In prior cases involving conspiracy provisions, the *Whitfield* Court observed, "where Congress had omitted from the relevant conspiracy provision any language expressly requiring an overt act, the Court would not read such a requirement into the statute." *Whitfield*, 543 U.S. at 213; *see also Singer v. United States*, 323 U.S. 338, 340 (1945)

11

(concluding that the Selective Service Act does not require an overt act for the conspiracy offense); *Nash v. United States*, 229 U.S. 373, 378 (1913) (concluding that the Sherman Act does not require an overt act for antitrust conspiracy liability). Absent an indication otherwise, we presume that "Congress intends to adopt the common law definition of statutory terms," and the common law understanding of conspiracy does not require an overt act for liability. *Shabani*, 513 U.S. at 13. The general conspiracy statute, 18 U.S.C. § 371, which "preceded and presumably provided the framework" for later conspiracy statutes, expressly includes an overt-act requirement. *Id.* at 14. With this in mind, the *Whitfield* Court distilled the following rule: if a statutory text is modeled on § 371, the general conspiracy statute, "it gets an overt-act requirement," but if it is modeled on the Sherman Act, 15 U.S.C. § 1, which omits any express overt-act requirement, "it dispenses with such a requirement." *Id.* at 14 (internal quotation marks omitted) (quoting *United States v. Sassi*, 966 F.2d 283, 284 (7th Cir. 1992)).

Salahuddin contends that *Whitfield* does not apply because its principle can only be invoked when the statutory text is plain and unambiguous, and the Hobbs Act, he maintains, is not. But the Supreme Court did not establish that a statute must be plain and unambiguous as a precondition to the application of its test in *Whitfield*; instead, it merely rejected petitioners' invitation to look at the statute's legislative history because the statute was plain and unambiguous. *Id.* at 215. More importantly, *Whitfield* is only the last in a line of Supreme Court decisions applying the principle that when a conspiracy statute is silent as to whether an overt act is required, there is no such requirement. Previous cases did not make a determination that a statute is plain and unambiguous a prerequisite to the application of the

principles of these cases. Furthermore, the conspiracy provision in § 1951 as it relates to an overt-act requirement *is* plain and unambiguous. The portions of the Hobbs Act that have been characterized as less than clear were distinct from the conspiracy provision at issue here. *See United States v. Manzo*, 636 F.3d 56, 62 (3d Cir. 2011) ("The scope of the term 'under color of official right' is not readily apparent from the face of the statute."). And finally, we have previously applied *Whitfield* to another conspiracy statute to determine whether it required an overt act, without first inquiring whether the statute was plain and unambiguous. *See United States v. Fullmer*, 584 F.3d 132, 160 n.13 (3d Cir. 2009) (applying *Whitfield* to the Animal Enterprise Protection Act to conclude that the language of the statute did not require an overt act, even though the district court had required it in its charge on conspiracy).

Applying *Shabani* and *Whitfield* here leads to the conclusion that Hobbs Act conspiracy under § 1951 does not require an overt act. Section 1951(a) provides:

> Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be fined under this title or imprisoned not more than twenty years, or both.

18 U.S.C. § 1951(a). This language is similar to the statutory language for conspiracy to commit money laundering – the crime at issue in *Whitfield* – which provides that "[a]ny

13

person who conspires to commit any offense defined in [§§ 1956 or 1957] shall be subject to the same penalties . . . ." 18 U.S.C. § 1956(h). Neither mentions anything about an overt act, unlike § 371, which provides for conviction of conspiracy "[i]f two or more persons conspire [] to commit any offense against the United States . . . *and one or more of such persons do any act to effect the object of the conspiracy* . . . ." 18 U.S.C. § 371 (emphasis added). Conspiracy under the Hobbs Act, like § 1956(h) but unlike § 371, makes no mention of a required act. Therefore we decline to read in an overt-act requirement.

Salahuddin urges that language in two decisions by this Circuit supports the

conclusion that an overt act is required. In *Manzo*, 636 F.3d at 68, and *United States v. Jannotti*, 673 F.2d 578 (3d Cir. 1982), both addressing Hobbs Act conspiracy, we mentioned "the principle that '[a]ll that was necessary, in addition to an overt act, was that the intended future conduct they had agreed upon include[d] all the elements of the substantive crime.'" *Manzo*, 636 F.3d at 68 (alterations in original) (quoting *Jannotti*, 673 F.2d at 593). This language originates from a case out of the Seventh Circuit, *United States v. Rose*, 590 F.2d 232, 235 (7th Cir. 1978), which dealt not with Hobbs Act conspiracy, but with burglary conspiracy. We, perhaps carelessly, allowed this language to creep in through a citation to *Rose* in the context of considering issues wholly unrelated to whether an overt act is required for Hobbs Act conspiracy. The statements in these cases regarding an overt act were dicta, as they did not consider the issue of whether an overt act is required for Hobbs Act conspiracy, discuss it at

14

any length, or hold that it was required.[2]  Therefore, *Manzo* and *Jannotti* did not hold and do not establish that an overt act is required for Hobbs Act conspiracy in this Circuit.

Several of our sister Circuits have already weighed in on whether an overt act is required for Hobbs Act conspiracy. Today, we join the First, Second, and Eleventh Circuits, which have held that an overt act is not a required element of Hobbs Act conspiracy.[3]  *See United States v. Monserrate-Valentin*, 729 F.3d 31, 62 (1st Cir. 2013) ("[A] Hobbs Act conspiracy does not require proof of an overt act.  Therefore, the district court did not err in declining to include the overt acts listed in the indictment as part of its instructions."); *United States v. Pistone*, 177 F.3d 957, 960 (11th Cir. 1999) (relying upon *Shabani* to conclude that "the government is not required to allege and prove an overt act in a prosecution for conspiracy to obstruct commerce in violation of 18 U.S.C.

---

[2] This Court has defined dictum as "a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding – that, being peripheral, may not have received the full and careful consideration of the court that uttered it."  *In re McDonald*, 205 F.3d 606, 612 (3d Cir. 2000) (internal quotation marks omitted) (quoting *Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir. 1986)).  Whether an overt act was required for Hobbs Act conspiracy was not at issue in either case, so the statements could easily have been deleted from both without impairing their holdings.

[3] We note that the Fourth Circuit has recently indicated that proof of an overt act is not required for a Hobbs Act conspiracy.  *See United States v. Ocasio*, 750 F.3d 399, 409 n.12 (4th Cir. 2014).

§ 1951"); *United States v. Clemente*, 22 F.3d 477, 480 (2d Cir. 1994) ("In order to establish a Hobbs Act conspiracy, the government does not have to prove any overt act."). The Fifth Circuit requires an overt act for Hobbs Act conspiracy.[4] *See United States v. Box*, 50 F.3d 345, 349 (5th Cir. 1995). However, the Fifth Circuit has not examined the overt-act requirement under the principles set forth in *Shabani* and *Whitfield*.

We conclude that proof of an overt act is not required for conviction of Hobbs Act conspiracy under 18 U.S.C. § 1951(a). Therefore, the District Court did not err, let alone plainly err, in leaving such a requirement out of the jury instructions. We also decline Salahuddin's request to apply the rule of lenity. The rule of lenity applies when "there is a 'grievous ambiguity or uncertainty in the statute.'" *Muscarello v. United States*, 524 U.S. 125, 139 (1998)

---

[4] Salahuddin maintains that the Sixth, Seventh, and Ninth Circuits also require an overt act for Hobbs Act conspiracy. However, the cases upon which he relies do not actually decide the issue. *See United States v. Corson*, 579 F.3d 804, 810 n. † (7th Cir. 2009) (observing the circuit split on the overt act requirement but declining to consider "whether proof of an overt act was required in this case" because the defendants did not appeal on that ground); *United States v. Nelson*, 66 F.3d 1036, 1044 (9th Cir. 1995) (observing that an overt act is required, but in a case dealing with money laundering conspiracy, not Hobbs Act conspiracy); *United States v. Uselton*, 974 F.2d 1339 (6th Cir. 1992) (*per curiam*) (unpublished table decision) (observing, in a case raising a double jeopardy challenge only, that the indictment count for Hobbs Act conspiracy included overt acts).

(quoting *Staples v. United States*, 511 U.S. 600, 619, n.17 (1994)). It "applies only if, after seizing everything from which aid can be derived, we can make no more than a guess as to what Congress intended." *Id.* (internal quotation marks and alterations omitted). Applying the principles set forth in *Shabani* and *Whitfield*, the language of the statute plainly indicates that an overt act is not required for Hobbs Act conspiracy. Therefore, this is not an occasion to apply the rule of lenity.

Finally, we address Salahuddin's contention that the failure to require proof of an overt act in the jury instructions constructively amended the indictment. He maintains that Count 1 of the indictment listed several "objects" of the conspiracy, and by dispensing with the Government's need to prove the overt acts allegedly charged as "objects," he was convicted on an alternate or expanded basis from that charged in the indictment. "An indictment is constructively amended when evidence, arguments, or the district court's jury instructions effectively 'amend[s] the indictment by broadening the possible bases for conviction from that which appeared in the indictment.'" *United States v. McKee*, 506 F.3d 225, 229 (3d Cir. 2007) (alterations in original) (quoting *United States v. Lee*, 359 F.3d 194, 208 (3d Cir. 2004)). Even assuming that these "objects" listed in the indictment were alleged overt acts – which the Government disputes – because we hold that proof of an overt act is not required for a Hobbs Act conspiracy conviction, the indictment was not constructively amended. The Government was not required to prove and the jury was not required to find that any overt acts occurred, so the failure to prove the alleged acts in the indictment did not "broaden[] the possible bases for conviction from that which appeared in the indictment." *McKee*, 506 F.3d at 229 (internal quotation marks omitted).

17

Because we hold that the statute imposes no overt act requirement for a Hobbs Act conspiracy conviction, we reject Salahuddin's arguments resting upon the theory that proof of an overt act was required for his conviction.

2.

Salahuddin contends that for a valid Hobbs Act conspiracy conviction, the jury must find that the defendant obtained something of value from the victim, which is a requirement of extortion. Because he was acquitted of the substantive bribery charges, which alleged several things of value that he extorted under color of official right, he argues that the jury necessarily found that he did not obtain anything of value and his conviction for conspiracy cannot stand. We exercise plenary review. *United States v. Introcaso*, 506 F.3d 260, 264 n.3 (3d Cir. 2007).

Salahuddin's argument misunderstands the requirements for inchoate offenses. He claims that because elements of the substantive offense were lacking, the inchoate offense of conspiracy must necessarily be lacking also. But the substantive and inchoate offenses are separate crimes requiring different proof. "Traditionally the law has considered conspiracy and the completed substantive offense to be separate crimes." *Iannelli v. United States*, 420 U.S. 770, 777 (1975). "Conspiracy is an inchoate offense, the essence of which is an agreement to commit an unlawful act." *Id.* "Because an agreement between two or more persons to commit criminal acts poses, in and of itself, a serious danger to social order, it is proscribed by the law of conspiracy." *Jannotti*, 673 F.2d at 591. The goal of the conspiracy – here, obtaining something of value under color of official right – need not be achieved for a conspiracy conviction. "The ultimate failure of the conspiracy may diminish, but does not

18

eliminate, the threat it poses to social order; therefore, the illegality of the agreement does not depend on the achievement of its ends." *Id.*

Salahuddin relies upon our opinion in *Manzo* in support of his argument,[5] but that case cannot be read to support the contention that proof that the defendant successfully obtained benefits is required for a Hobbs Act conspiracy conviction. In *Manzo*, we considered whether

[5] Salahuddin also relies upon the Supreme Court's decision in *Scheidler v. National Organization for Women, Inc.*, 537 U.S. 393 (2003). In *Scheidler*, the Supreme Court held that "[b]ecause petitioners did not obtain or attempt to obtain respondents' property," there could be no basis for Hobbs Act extortion claims, state extortion claims, or claims of conspiring or attempting to extort. *Id.* at 410. *Scheidler* focused on the nature of the claimed property rights in finding no extortion. The respondents maintained that the petitioners sought to obtain "a woman's right to seek medical services from a clinic, the right of the doctors, nurses or other clinic staff to perform their jobs, and the right of the clinics to provide medical services free from wrongful threats, violence, coercion and fear." *Id.* at 400-01. The Court concluded that although the petitioners may have deprived the respondents of these property rights, they did not acquire the property, because the nature of the property rights rendered them incapable of being "obtained," which was necessary to commit extortion under the Hobbs Act. *Id.* at 405. The claimed property rights here –business, charitable contributions, and money – are of a very different nature than those claimed in *Scheidler*. They are capable of being acquired and therefore do not present the same problems as the property rights at issue in *Scheidler*.

19

acting "under color of official right" was a required element of the inchoate Hobbs Act extortion offenses. 636 F.3d at 59. We concluded that acting "under color of official right" was required even for the inchoate offenses because it is a necessary status element of any Hobbs Act violation that does not involve threatened force, violence or fear. *Id.* at 66-67. We acknowledged that "the government need not prove every substantive element of an offense to establish an inchoate offense," *id.* at 66, but "[a] Hobbs Act inchoate offense prohibits a person acting 'under color of official right' from attempting or conspiring to use his or her public office in exchange for payments," *id.* at 68-69. "To sustain an 'under color of official right' Hobbs Act charge [where defendants were not public officials or holding themselves out as such] would create a legal alchemy with the power to transform any gap in the facts into a cohesive extortion charge . . . ." *Id.* at 69 (internal quotation marks omitted).

Key to the determination that the government was required to prove "under color of official right" for inchoate Hobbs Act offenses was the conclusion that it was a "status element." Proving that a defendant successfully obtained benefits is not a status element. Obtaining benefits is the desired outcome, object, or goal of the extortion. Indeed, successfully obtaining benefits in many instances completes the extortion. We observed in *Manzo* that "a Hobbs Act conspiracy charge does not even require that 'the ends of the conspiracy were from the very inception of the agreement objectively [] attainable.'" *Id.* at 66 (alteration in original) (quoting *United States v. Hsu*, 155 F.3d 189, 203 (3d Cir. 1998)). If it is not even required that the ends of the conspiracy be *attainable*, it is surely not required that they actually be *achieved*.

Requiring the government to prove that Salahuddin successfully obtained benefits would go much further than what is required under conspiracy law. It is the illegal agreement that is criminalized in Hobbs Act conspiracy; the actual completion of the agreed-upon venture is immaterial. We therefore reject Salahuddin's contention that the jury was required to find that he obtained benefits and that the acquittal on the substantive extortion counts undermines his conspiracy conviction.[6]

3.

Salahuddin raises two issues with his conviction's foundation upon Mazzocchi's charitable and political contributions to Newark Now, Empower Newark, and then-Mayor Booker. He argues first that the Government was required to allege in the indictment that these entities were "acting in concert" with Salahuddin. Second, he argues that the District Court erred in failing to instruct the jury that for the conviction to be based upon charitable contributions – to

---

[6] Salahuddin argues that the acquittals on the substantive extortion counts result in a "legal insufficiency" or lack of requisite "crystallization" of criminal intent for Hobbs Act conspiracy. Salahuddin Br., at 36 & n.10. But bribery – of which he was acquitted – and Hobbs Act conspiracy have different elements and are charged under different statutes. Even if the verdicts were inconsistent, we could not review them, as the Supreme Court made inconsistent verdicts "unreviewable." *United States v. Powell*, 469 U.S. 57, 63 (1984). A defendant cannot "challenge an inconsistent verdict involving a conviction of a conspiracy and an acquittal on a predicate act." *United States v. Maury*, 695 F.3d 227, 264 (3d Cir. 2012).

Newark Now and Empower Newark – it must find that there was an explicit *quid pro quo* agreement.

Salahuddin failed to preserve these issues below. "[I]ndictments which are tardily challenged are liberally constructed in favor of validity." *United States v. Vitillo*, 490 F.3d 314, 324 (3d Cir. 2007) (internal quotation marks omitted) (quoting *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)). We will uphold the indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense" under the relevant criminal statute. *Id.* (internal quotation marks omitted) (quoting *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995)). We review Salahuddin's objections to the jury instructions issued by the District Court for plain error. *Dobson*, 419 F.3d at 236.

With respect to his first argument, Salahuddin relies primarily upon the Third Circuit's Model Criminal Jury Instructions. They provide: "The government may show that the benefit was meant to be given to the public official directly, or to a third party who is not a public official but who was *acting in concert* with the public official." 3d Cir. Model Crim. Jury Instr. § 6.18.1951-6 (emphasis added). The District Court charged the jury using this exact language, including the "acting in concert" requirement. *See* JA 2985. While it is far from clear that our case law imposes an "acting

22

in concert" requirement, to the extent that there is, the jury instructions complied.[7]

While the indictment does not use the specific "acting in concert" language, it can be fairly read to imply that Salahuddin acted in concert with the Newark officials raising funds for these charities. The indictment stated that as a part of the conspiracy, "Salahuddin solicited and accepted contributions to organizations supported by City of Newark officials from [Mazzocchi], which defendant Salahuddin claimed would further enable him to secure demolition work and other valuable benefits for [Mazzocchi] and [his] company." JA 6-7. Challenged at this tardy stage and on review for plain error, we cannot say that the indictment's language is "so defective that it does not, by any reasonable construction, charge" that Salahuddin was "acting in concert" with the charitable organizations receiving Mazzocchi's donations.

---

[7] Although the model jury instruction includes this language, the Third Circuit cases cited in the comment do not address an "acting in concert" situation, as they involved direct payments. *See United States v. Antico*, 275 F.3d 245 (3d Cir. 2001) (declining to apply an explicit *quid pro quo* requirement in a case that involved direct payments to the official); *United States v. Bradley*, 173 F.3d 225 (3d Cir. 1999) (declining to apply an explicit *quid pro quo* requirement in a case involving direct payments to the public official and his defendant-girlfriend, without discussion of "acting in concert"). Insofar as we need not – and do not – decide this issue of an "acting in concert" requirement to dispose of Salahuddin's appeal, our opinion here should not be read as holding that there is an "acting in concert" requirement when the benefit is given to a third party.

Salahuddin argues second that the jury was required to find an explicit *quid pro quo* arrangement for the charitable contributions sought from Mazzocchi, and the District Court erred in failing to instruct the jury as such.[8] We have previously rejected attempts to require an explicit *quid pro quo* arrangement outside of the campaign contribution context. *See Bradley*, 173 F.3d at 232 (approving an instruction without an explicit *quid pro quo* requirement because "a conclusion that in a Hobbs Act case the government has to demonstrate that the public official made an express promise to perform a particular act and that 'knowing winks and nods' are not sufficient would frustrate the act's effect" (quoting *United States v. Evans*, 504 U.S. 255, 274 (1992))). As neither the Supreme Court nor this Court requires an explicit *quid pro quo* for non-campaign charitable contributions – such as those to Empower Newark and Newark NOW – the District Court cannot have plainly erred in failing to instruct the jury as such.[9]

---

[8] He also argues that his conviction cannot stand because he did not receive any benefits from the charitable contributions. But as discussed in Part III.A.2 above, successfully obtaining benefits is not required for a Hobbs Act conspiracy conviction.

[9] An explicit *quid pro quo* is required for extortion based upon campaign contributions. *McCormick v. United States*, 500 U.S. 257, 273 (1991). The District Court did instruct the jury that in the context of political contributions:

> [I]f a particular defendant as a public official solicits, receives, obtains, or accepts a political contribution knowing that it is given in

The District Court instructed the jury as follows: "[T]he government must prove beyond a reasonable doubt that the public official knowingly and willfully, as those terms are defined later in these instructions, used his official position in order to obtain something of value to which he had no right." JA 2985. Under the Supreme Court's precedent in *Evans*, "the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts." 504 U.S. at 268. As the jury instructions followed this precedent, the District Court did not plainly err.

4.

Salahuddin raises issues with two other aspects of the jury instructions. He argues that the District Court erred in failing to instruct the jury that it must unanimously decide which one of the "objects" of the conspiracy the defendants agreed to pursue. He also argues that the District Court erred in failing adequately to define "extortion under color of official right" in the jury instructions on Hobbs Act conspiracy. As Salahuddin failed to object to the jury instructions before the District Court or submit an instruction

> exchange for an *explicit promise* or understanding by the official to perform or not to perform a specific official act or course of official action, then that defendant has committed extortion under color of official right and bribery.

JA 2987-88. This instruction complies with the applicable precedent with respect to Mazzocchi's contribution to a fundraiser for then-Mayor Booker.

25

of his own, we review these claims for plain error. *Dobson*, 419 F.3d at 236.

With respect to the unanimity instruction, Salahuddin maintains that the District Court ought to have augmented – *sua sponte* – the general unanimity instruction to ensure that the jury understood that it must unanimously agree to facts supporting at least one object of the conspiracy. The "objects" of the conspiracy, according to the indictment, were to obtain money and benefits, including demolition business and contributions, through Salahuddin's position. These "objects" are simply the benefits that the conspirators sought to obtain through their agreement.

Salahuddin looks to our decision in *United States v. Beros*, 833 F.2d 455 (3d Cir. 1987), in support of his contention. In *Beros*, we determined that the general unanimity instruction did not suffice where the defendant had been charged in the indictment with numerous acts, each of which could constitute a violation of the relevant statute. *Id.* at 461. Because in theory, twelve jurors could have agreed that the defendant violated the statute but with each juror predicating his or her conclusion upon different acts, the jurors ought to have been instructed that they must unanimously agree as to which specific act or acts supported his guilt. *Id.* at 461-62.

*Beros* is distinguishable from Salahuddin's case for several reasons. First of all, there is a difference between the multiple alleged *acts* which could each constitute an offense in *Beros*, and the multiple alleged *benefits* which the defendants allegedly sought to obtain through the conspiracy here. Because the specific benefits that the members of the conspiracy sought to obtain is not a required element of Hobbs Act conspiracy, the jury need not have been

26

specifically instructed as to unanimity in this regard. *See, e.g.*, *United States v. Wise*, 515 F.3d 207, 214 (3d Cir. 2008) ("[T]he jury was not required to unanimously agree on the type of weapon that [the defendant] possessed, because a specific type of firearm is not an element of a violation under 18 U.S.C. § 924(c)(1)(A)."). Conspiracy seeks to punish only the *act* of agreeing to commit an offense, so the jury verdict only needs to be unanimous as to that act, not as to the multiple benefits that the defendants allegedly sought to obtain by entering into the agreement. *See Shabani*, 513 U.S. at 16 ("[T]he criminal agreement itself is the *actus reus* . . . ."). *Beros* is further distinguishable because the defendant in *Beros* had preserved the issue of the unanimity instruction in the district court below, whereas here, we are conducting plain error review. *Beros*, 833 F.2d at 463. We conclude that the District Court did not err, let alone plainly err, in failing to issue a specific unanimity instruction *sua sponte*.

Turning to the District Court's jury instructions on the meaning of the substantive Hobbs Act offense, Salahuddin asserts that the District Court erred by failing to define "extortion under color of official right" in the instructions as to the Hobbs Act conspiracy offense. The District Court instructed the jury that for the Hobbs Act conspiracy count:

> The government must prove beyond a reasonable doubt that two or more persons knowingly and intentionally arrived at a mutual understanding or agreement, either spoken or unspoken, to work together to achieve the overall objective of the conspiracy, in sum, to obtain payments and other valuable benefits by extortion under color of official right, *as I will describe for you later in these instructions*.

JA 2976-77 (emphasis added). Moments later, in recounting the instructions on the Hobbs Act attempt charge, the District Court further instructed:

> Extortion under color of official right means that a public official induced, obtained, accepted, or agreed to accept a payment or valuable benefit to which he was not entitled knowing that the payment or valuable payment accepted or to be accepted was made in return for taking, withholding, or influencing official acts.

JA 2984-85. This instruction tracks the Third Circuit's Model Criminal Jury instructions and adequately defines the relevant terms under the governing case law. *See United States v. Urban*, 404 F.3d 754, 768 (3d Cir. 2005) ("In order to prove Hobbs Act extortion 'under color of official right,' 'the Government need only show that a public official has obtained a payment to which he was not entitled, knowing that the payment was made in return for official acts.'" (quoting *Evans*, 504 U.S. at 268)). The few moments of delay before the jury was fully and properly instructed on the meaning of "extortion under color of official right" do not constitute plain error.

## B. Cooper

Cooper raises four issues on appeal. We address in Part III.B.1 Cooper's argument that the jury's guilty verdict was against the weight of the evidence. In Part III.B.2, we address his challenge to the sufficiency of the evidence. Finally, we address his contention that the District Court

28

erred in denying his motion to vacate his conviction and dismiss the indictment on account of the Government's alleged selective prosecution and outrageous conduct in Part III.B.3.

1.

Cooper contends that the jury's guilty verdict as to the Hobbs Act conspiracy charge is against the weight of the evidence. He first made the arguments supporting this contention before the District Court in a motion for a new trial under Federal Rule of Criminal Procedure 33. Under this rule, the district court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred – that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)). "Thus, '[m]otions for a new trial based on the weight of the evidence are not favored. Such motions are to be granted sparingly and only in exceptional cases.'" *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (alteration in original) (quoting *Gov't of V. I. v. Derricks*, 819 F.2d 50, 55 (3d Cir. 1987)). When evaluating a Rule 33 motion, the district court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case." *Johnson*, 302 F.3d at 150.

The District Court denied Cooper's Rule 33 motion after thoroughly examining his arguments and the evidence supporting the conspiracy conviction. The District Court concluded that the evidence supported the jury's finding and

29

many of Cooper's arguments were more properly made to a jury. We review a district court's denial of a Rule 33 motion for abuse of discretion. *Brennan*, 326 F.3d at 189.

Cooper's arguments that the jury's verdict was against the weight of the evidence can be categorized into two groups: (1) challenges to Mazzocchi's trial testimony as biased, false, and contradictory; (2) alleged failures in the Government's evidence presented at trial that undermine the jury's verdict. The District Court carefully evaluated all of Cooper's contentions, which he repeats on appeal. We have reviewed the evidence presented at trial alongside Cooper's arguments, and conclude that the District Court did not abuse its discretion in denying Cooper's motion.

The majority of Cooper's arguments amount to challenges to Mazzocchi's credibility and motives. He argues that Mazzocchi gave false and inconsistent testimony and manufactured the conspiracy as reflected in the recordings. We can entirely reject these arguments, as the jury was made aware – through cross-examination, closing arguments, and the jury instructions[10] – of Mazzocchi's motivations, potential

---

[10] The District Court instructed the jury:

bias, and inconsistent testimony. Equipped with this knowledge, it was the jury's responsibility to decide whether or not to believe Mazzocchi's testimony.

In suggesting that Mazzocchi's testimony could not be believed, and therefore the verdict was against the weight of the evidence, Cooper points to numerous alleged

---

Cooperating witness testimony was received in evidence and may be considered by you. The government is permitted to present the testimony of someone who has received a promise from the government that he will not be prosecuted and who has received a promise from the government that his testimony will not be used against him in a criminal case, but you should consider that witness' testimony with great care and caution. In evaluating his testimony, you should consider this factor along with the others I have called to your attention. Whether or not Mr. Mazzocchi's testimony may have been influenced by the government's promises is for you to determine. You may give his testimony such weight as you think it deserves.

JA 3014-15.

inconsistencies in Mazzocchi's testimony.[11]    But many of these claimed inconsistencies are minor or more ambiguous than Cooper makes them out to be.  Mazzocchi's testimony described numerous meetings, conversations, and transactions between himself and the defendants, it was lengthy, and it was subject to cross-examination by counsel for both Salahuddin and Cooper.   Some minor contradiction or confusion is understandable.  Even if the inconsistencies were more glaring than they appear to be, "[a] jury is free to believe part of a witness' testimony and disbelieve another part of it." *United States v. Boone*, 279 F.3d 163, 189 (3d Cir. 2002).  It was the jury's responsibility to weigh Mazzocchi's credibility considering his entire testimony, including the alleged inconsistencies.

Contrary to Cooper's arguments, Mazzocchi's testimony was not the Government's only evidence of the conspiracy.   Much of the evidence against Cooper and Salahuddin came from their own mouths, through recorded conversations.  Therefore, any inconsistencies and credibility issues with Mazzocchi's testimony do not render the jury verdict against the weight of the evidence.

The remainder of Cooper's arguments implicate isolated pieces of evidence presented at trial, which he

---

[11] For example, Cooper observes that Mazzocchi first testified that Salahuddin introduced him to Cooper.  He then admitted that was not the case, he had been introduced to Cooper by Parlavecchio.   Cooper also contends that Mazzocchi contradicted himself by first acknowledging that he wished to gain access to business Cooper obtained through minority set-aside contracts but then stating that the plan the whole time was to use Salahuddin's influence to obtain business.

believes undermine the Government's proof of the elements of the conspiracy. Through these arguments, Cooper asks us to look one-sidedly at small, isolated portions of the record to conclude that the verdict was against the weight of the evidence. But when each instance he raises is placed in the proper context, it becomes clear that ample evidence – albeit sometimes circumstantial – supported the conspiracy.

To the extent that Cooper challenges the lack of direct evidence against him, that argument fails. While there may not have been direct evidence of a *quid pro quo*, the evidence of bribery and the unlawful nature of their agreement could be proven circumstantially. *McKee*, 506 F.3d at 238 ("[A] conspiratorial agreement can be proven circumstantially based upon reasonable inferences drawn from actions and statements of the conspirators or from the circumstances surrounding the scheme.").

Cooper suggests that Mazzocchi's admission that he paid Cooper a fair price for legitimate work that was completed undermines the jury's finding of a conspiracy. But as the District Court observed, "[t]he issue is not how much Cooper was paid for his work, but how he received the work in the first place." *United States v. Salahuddin*, No. 10-104, 2012 WL 2952436, at *14 (D.N.J. July 19, 2012). Similarly, Cooper suggests that his ambivalence about whether Mazzocchi paid him with cash or a check and his lack of effort to conceal the $5,000 payment he made to Salahuddin show that he did not have the intent to commit extortion. The jury was free to make this inference; however, there was ample evidence indicating that Cooper wished to join the conspiracy and conceal other aspects of his relationship with Salahuddin. For instance, Cooper stated of Salahuddin, "he's a political guy so he can't get involved" in Mazzocchi's subcontracting work to Cooper. SA 172. And while Cooper

33

argues that their relationship merely indicated that they were close friends, the jury was free to credit circumstantial evidence indicating a concealed business relationship instead.

Cooper contends that Salahuddin's openness in his attempts to push Mazzocchi for city demolition contracts demonstrates a lack of illicit purpose. But the jury could infer that because Salahuddin did not have any actual authority over demolition contracts, he had to use Mazzocchi's name in urging those who controlled the process to award them to Mazzocchi. The illicit purpose is supported by Salahuddin's failure to reveal Mazzocchi's arrangement to subcontract work to Cooper and his own connection to Cooper.

Cooper argues that the conspiracy conviction is undermined because Salahuddin told Mazzocchi that he did not need to subcontract work on one particular job to Cooper, stating that Mazzocchi could "do something for him" if he could, but if he could not "on this one, don't worry about it." SA 303. But the jury could also construe this conversation, along with the discussions of the other work the defendants and Mazzocchi hoped to obtain, as showing that their relationship was an ongoing one. It could conclude that Mazzocchi did not need to subcontract to Cooper on this smaller job because there were bigger ones coming down the pipeline.

Ultimately, the arguments that Cooper makes do not come close to suggesting "that there is a serious danger that a miscarriage of justice has occurred." *Johnson*, 302 F.3d at 150 (internal quotation marks omitted). His arguments about credibility and challenges to portions of the Government's evidence were made to the jury, who were free to reject them. We conclude that the District Court did not abuse its

34

discretion in rejecting Cooper's arguments that the jury's verdict was against the weight of the evidence and denying his motion for a new trial.

2.

Cooper argues next that the District Court erred in denying his motion for judgment of acquittal under Federal Rule of Criminal Procedure 29. He maintains that there was insufficient evidence presented to the jury to allow them to find that the Government had sustained its burden of proving each element of the alleged conspiracy. The District Court denied Cooper's motion.

"We exercise plenary review over a district court's grant or denial of a motion for judgment of acquittal based on the sufficiency of the evidence, applying the same standard as the district court." *United States v. Starnes*, 583 F.3d 196, 206 (3d Cir. 2009). We "review the record in the light most favorable to the prosecution to determine whether any rational trier of fact could have found proof of guilt[] beyond a reasonable doubt based on the available evidence." *United States v. Brodie*, 403 F.3d 123, 133 (3d Cir. 2005) (internal quotation marks omitted) (quoting *United States v. Smith*, 294 F.3d 473, 476 (3d Cir. 2002)). "The burden on a defendant who raises a challenge to the sufficiency of the evidence is extremely high." *Starnes*, 583 F.3d at 206 (internal quotation marks omitted ) (quoting *United States v. Iglesias*, 535 F.3d 150, 155 (3d Cir. 2008)).

In support of his sufficiency-of-the-evidence claim, Cooper incorporates all of the arguments and contentions made in his challenge to the weight of the evidence, discussed above. We need not revisit these arguments at length. To the extent that they challenge Mazzocchi's credibility, the jury knew of his potential bias and the inconsistencies in his

35

testimony, yet still a rational trier of fact could have credited his testimony. And while isolated pieces of evidence could support a not guilty verdict, copious recorded testimony supports the jury's verdict. For the same reasons discussed above, these arguments cannot lead us to conclude that no rational trier of fact could have found Cooper guilty of conspiracy to extort under color of official right.

Cooper also argues that the inconsistency of the jury's not guilty verdict on the Hobbs Act attempt charge with the guilty verdict on the Hobbs Act conspiracy charge should be considered in evaluating the sufficiency-of-the-evidence claim. He maintains that it was impossible for a rational jury to determine that Cooper conspired to commit extortion under color of official right, but did not attempt to do so. The acquittal, he argues, shows that the jury determined that he either lacked the intent to commit extortion or that he did not take a substantial step *in furtherance of the conspiracy*, either of which would undermine the conspiracy conviction.

This argument misunderstands the requirements of attempt as compared to conspiracy. An attempt conviction requires that the defendants acted with the requisite intent to violate the Hobbs Act and performed an act that constituted a substantial step *towards the commission of the crime. Manzo*, 636 F.3d at 66. The jury did not inquire whether Cooper performed a substantial step in furtherance of the conspiracy, because conspiracy and attempt are different crimes. The two inchoate offenses address different conduct, and "along the continuum of different criminal activity, attempt crimes are closer to completed crimes than are conspiracy crimes." *United States v. O'Brien*, 972 F.2d 47, 52 (3d Cir. 1992). As discussed above, Hobbs Act conspiracy does not even require an overt act. A rational jury could have reasonably concluded that Cooper entered an agreement intending to commit

extortion under color of official right, but took no substantial step in furtherance of committing that crime.

Furthermore, the jury's acquittal on the attempt count is irrelevant to our review of the sufficiency of the evidence on the conspiracy count. Review to determine whether there was sufficient evidence to convict on a particular count "should be independent of the jury's determination that evidence on another count was insufficient." *Powell*, 469 U.S. at 67. We conclude that the evidence was sufficient to support the jury's verdict for the reasons discussed above and in the District Court's lengthy opinion. The District Court did not err in denying Cooper's motion for judgment of acquittal.

3.

Cooper argues that the District Court erred in denying his motion to vacate his conviction and dismiss the indictment on account of selective prosecution and outrageous government conduct. We conclude – as the Government urges – that these claims are waived due to Cooper's failure to raise them before trial.

Under the Federal Rules of Criminal Procedure, "a motion alleging a defect in instituting the prosecution" must be raised before trial. Fed. R. Crim. P. 12(b)(3)(A). Claims of selective prosecution and outrageous government conduct allege defects in the institution of the prosecution. *See United States v. Pitt*, 193 F.3d 751, 760 (3d Cir. 1999) ("[T]he defense of outrageous government conduct is based on an alleged defect in the institution of the prosecution itself."); *United States v. Berrigan*, 482 F.2d 171, 175 (3d Cir. 1973) ("The question of discriminatory prosecution relates not to the guilt or innocence of the appellants, but rather addresses itself to a constitutional defect in the institution of the prosecution."). We have observed that a pretrial motion is

37

necessary to a claim of outrageous government prosecution "unless the evidence supporting the claim of outrageous government conduct is not known to the defendant prior to trial." *Pitt*, 193 F.3d at 760. The same logic applies to a claim for selective prosecution. Therefore, we hold that claims of outrageous government conduct and selective prosecution must be made in a pretrial motion, unless the evidence supporting these claims were not known to the defendant prior to trial.

Cooper raised neither the selective prosecution claim nor the outrageous government conduct claim before trial. Instead, he raised them in a post-trial motion. Cooper has presented no explanation or excuse for his failure to present these arguments prior to trial. He had sufficient opportunity to do so, as the evidence upon which he now relies in support of these claims was available to him well before trial.[12] We conclude that Cooper waived these defenses by failing to raise them in a pretrial motion as required under Rule

---

[12] Cooper bases his selective prosecution and outrageous government conduct claims on the Government's alleged relinquishment of prosecutorial authority and agency to Mazzocchi. Cooper contends that Mazzocchi is racist, and chose to focus the investigation upon Cooper and Salahuddin due to his racial animus. But Cooper was aware that the Government chose to prosecute only Salahuddin and himself – both African-American – and not Mazzocchi and Parlavecchio – both Caucasian – from the time of institution of the proceedings against him. He relies upon transcripts of taped conversations between Mazzocchi and Parlavecchio to demonstrate Mazzocchi's alleged racial animus, but these recordings were made available to him almost a year before trial began.

12(b)(3)(A). Because he has given no explanation or excuse for his failure to raise them previously, we need not make an exception to Cooper's waiver. *See Pitt*, 193 F.3d at 760 (refusing to grant an exception to a waiver finding because defendant had offered no explanation for failure to raise the defense in a pretrial motion).

## IV.

For the foregoing reasons, we will affirm the District Court's judgments of conviction for both Salahuddin and Cooper.